Executive Department, N. C.,) Raleigh, March 2, 1863. j
Ron, It. M. Pearson, Ghief Justice

of North Oarilvna:

Dear Sir : — You are aware that the Legislature, by a joint resolution, declared the office of Adjutant General vacant, by reason of the incumbent’s having accepted an incompatible office under the Confederate States’ government, and that by a subsequent act the appointment was conferred upon the Governor.
Gen. Martin, the present incumbent, having declared his intention of testing the legality of this action of the Legislature by an appeal to the'courts, I am placed in a position rather embarrassing. To avoid the somewhat unpleasant spectacle of a lawsuit for the possession of an office, confidential in its relation to myself, and very important to the public at this time, I have concluded, with the consent oí Gen. Martin, to make a case and ask the opinion of the Supreme Court immediately thereon.
With this view I should be greatly obliged, and I have no doubt the public interest would also be subserved, if yon would have the kindness to call the Court together and give its opinion upon the question. As early a day as possible is respectfully requested
Yery respectfully, your ob’t serv’t,
Z. B. YANCE.
CASE AGREED.
At the recent session of the General Assembly,, the Legislature, having resolved, “ that by reason of the acceptance by Gen. James G. Martin, Adjutant General of North Carolina, of the office of Brigadier General of the army of the Confederate States the said office of Adjutant General was surren *154 dered and is declared to be vacant,” and having enacted also, that the power of appointing to said office of Adjutant General should be vested in the Governor ; and his excellency Governor Yance, having indicated to General Martin his purpose to proceed to make an appointment thereto, it was insisted by General Martin, that the office was filled, and he was the proper and lawful incumbent thereof, notwithstanding the resolution aforesaid, by virtue of his election to said office, by the preceding Legislature, under the act of the General Assembly, entitled “ Militia,” chapter 17, ratified on the,20th day of September, 1861. Whereupon, it was agreed by the Governor and General Martin, to request the Judges of the Supreme Court to give their opinions upon the question, whether the office was vacant, and the Governor might lawfully proceed to appoint thereto.
The question upon which the opinions of the Judges are sought, arises out of the following agreed facts:
In the month of September, 1861, Gen. James G. Martin was duly elected by the Legislature, Adjutant General of the State of North Carolina, in pursuance of a statute on the subject of the State Militia, ratified on the 20th day of September, 1861, accepted the office, was qualified, and' entered upon the duties thereof, and has continued since to exercise the powers and perform the duties of the same.
General Martin held the rank of Captain and Brevet Major in the army of the United States, tendered his resignation at Fort Riley, Kansas, June 1st, 1861, and by the. provisions of the law of the Confederate States, he became entitled to similar rank in the regular army of the Confederate States, and received and accepted the appointment therein of a Captain of Artillery, and at the request of the Governor of North Carolina, was ordered to report to him for duty.
In the month of May, 1862, General Martin accepted the office of Brigadier General in the Provisional army of the Confederate States, under the following circumstances : The appointment had been some days tendered, but not accepted, when Governor Clark received a telegram from the President, urging him to send General Martin with four regiments, then *155 in camp near the city of Raleigh, and which had not then been mustered into the Confederate service, to Weldon.
General Martin then had an interview with the Governor, and it was concluded between them that he should accept the appointment of Brigadier General, in order to comply with the request of the President, but with tire understanding that it was not to vacate his office of Adjutant General.
In a day or two afterwards, and before the regiments moved, General Martin was ordered by General Holmes, commanding in .this department, to repair with these regiments to Kinston, which lie did.
He remained there some six weeks, and while there, had also authority from the Governor, in his capacity of Adjutant General, to call out, for active.service, the militia in the adjacent counties.
While the battles near [Richmond were being fought, Gov. Clark telegraphed the President that he thought Gen. Martin and his Brigade could be spared from the State, if he deemed it important to have them; and in consequence, Gen. Martin receiving an order from General Holmes, then below Richmond, repaired with his Brigade to Drury’s Bluff, on James river. The battle was over before he readied that point.
A few days after reaching Drury’s Bluff, Gen. Martin tendered his resignation as Brigadier General for the purpose of returning to North Carolina, to resume the discharge of th© duties of Adjutant General, in person. About ten days after-wards, he was notified of the acceptance of his resignation. While at Drury’s Bluff, by the request of Gov. Clark, he also-transacted business as Adjutant General of the State, with the Confederate authorities in. Richmond.
Upon the interposition of General t.ee, and with the approbation of Governor Clark, and consent of General Martin, the resignation of General Martin and the acceptance thereof, were annulled, and he was reinstated in the office of Brigadier General, but has never received any pay either as Brigadier General in the Provisional army or Captain in the regular army, and has since remained in the City of Raleigh in the discharge of the duties of Adjutant General, except when absent by the orders or assent of the Governor of the State.
*156 B. F. Moore, Fsq, who appeared for the Attorney General, in his absence from the City, submitted the following argument:
According to the well-settled rules of the common law, the same person might hold so many offices as he could discharge the duties thereof, unless the duties of some might be incompatible with the duties of some other. In all such cases, the common law forbade the same person to hold incompatible offices, upon the clearest principle of reason, namely, that the offices could not, or might not be well and faithfully discharged. Hence the well established maxim that the valid acceptance of one office by a person already holding another and incompatible office, vacated the former as effectually as an actual surrender of it. Indeed, it was regarded as an abdication, and, therefore, a quasi resignation; Milward v. Thatcher, 2 T. R. 81; Rex v. Trelawny, 3 Bur. 1616.
It is manifest as well from reason as from the temper of those times, that it was never the purpose of the provisons in the Constitution and laws of the State making new cases of disqualification, to abrogate those already existing; especially when it is considered that the latter were so because reason required it, and to no small extent, it must be admitted, that the former are the results of the extreme jealousies of the times.
The main source of these Constitutional and legislative provisions is to be found in the two-fold motive of preventing a concentration in one person of two lucrative offices, and of excliiding the influence which the possession of one office might exert to procure another.
The first disqualifications in this State by reason of holding another office, (superaddcd to those existing at the common law) the duties of which were not deemed incompatible with those of the office inhibited, were introduced into the State Constitution in 1776, and are found in sections 25, 26, 27, 28, 29 and 80, and are all exclusively political, both in their character and extent, except that of section 25, which excludes defaulting receivers of public money, in, as well as out of office, from all offices during the default. The disqualifications *157 found in these sections, with the exception aforesaid,, excluded high officers from the legislature and council of State. They were introduced, because it was deemed by the framers of the Constitution that, although in England the officers of the public treasury, of the army and navy, council of State, judiciary, Secretary of State, Attorney General, &c., were allowed to sit in parliament, their influence in a legislature, elected from the body of the people, would not well consist with the genius of our republic, which it was thought ought to secure perfect freedom in the legislative halls from every species of official influence. If the Constitution had stopped here in its disqualifications for office, the common law doctrine, which allowed many offices to be held by one person, subject only to the restriction of compatibility, would have been affected only to the extent of those provisions. But with republics the distribution of offices has been at all times a favorite doctrine of policy ; and we find afterwards in section 35, a provision “ that no person shall hold more than one lucrative office at any ene time: Provided, that no appointment in the militia orto the office of justice of the peace, shall be considered as a lucrative office
The effect of this provision was to greatly limit the range of the common law doctrine of incompatible offices; it narrowed, but did not annul its operation. Among other persons it did not embrace a member of the legislature, who, although he received a per diem allowance, was not regarded as holding a lucrative office. And it is clear that it did not embrace offices not derived under this State. And by reason of the proviso, it did not embrace that portion of the judiciary establishment constituted of justices of the peace, nor any officer of the militia. So that a militia officer, although his office had been lucrative in fact, could, notwithstanding this section, hold another lucrative office, provided the only objection to such holding was the lucrativeness of the office.— All other objections, as that, for instance, of incompatibility, were left untouched, the only effect of the proviso being to declare that an office in the militia should not be deemed lucrative. Whatever office, without this section, would have been incompatible with an office in the militia by reason of *158 the nature of its duties, was left so still. That the proviso has never been construed to confer a license to hold incompatible offices is obvious from the acts of 1808, c. 747, and 1809, c. 767, Revisal of 1820, (retained in the Revisáis of 1836 and 1854,) which, among other things, imposes a penalty on a justice of the peace for exercising, while he acts as such, the incompatible offices of clerk, deputy clerk, deputy sheriff, constable, county trustee and jailor. The provision was extended in 1836, by R. S. c. 62, s. 5, to embrace a sheriff; the omission before was, doubtless, because the offices of sheriff and justice of the peace were held to be incompatible at common law; 1 Blackstone, 349, et seq. to 354, and note 34, p. 358. There never has been made a question about the constitutionality of this legislation ; and it may be safely affirmed, that as to many, if not all of the offices mentioned, the legislation was but in affirmance of the common law.
Indeed, the proviso was never construed to confer a constitutional right to hold two offices of any kind. The whole effect of the section was to forbid the holding of two lucrative offices. It did not secure a constitutional right to hold one that was lucrative and another that was unlucrative. It was still competent for the Legislature to forbid a citizen to hold two offices of any kind. This, as is seen, vras done as to sundry State offices, and it was done at an early period, likewise as' to both federal and State offices. Thus in 1790, (R. C. of 1820, c. 319,) after reciting that “ sound policy dictates the measure of keeping separate and distinct the officers acting under the authority of the United States, from acting in any legislative, executive, judiciary, or other situation, under the authority of the State,” it enacts that no citizen of the State, holding under the United States Government “ any office of trust, profit, -or emolument, shall be eligible to a seat in the General Assembly, nor shall hold at the same time any such office under the authority of the United States, and any office or authority, either civil, military, judiciary, or otherwise under the authority of the State.” “ Senators and representatives to the United States Government,” are expressly included, and it is enacted that “ upon any person accepting any such appointment under the United States, and holding any office *159 or appointment under the authority of this'State, the State appointment is hereby declared vacant.”
In 1792, (c. 366,) it was made penal to violate the said act. In 1793, (c. 393,) the prohibition was repealed as to senators and representatives holding commissions of justice of peace. In 1796, (c. 450,) it was declared that judicial, executive and revenue officers, fall within the meaning and intent of the act of 1790, and by same act members of Congress are allowed to hold commissions in the militia. By the act of 1811, (c. 811,). justices of the peace and officers of militia are allowed to hold offices under the authority of the United States, if the duties of such offices are confined to the State. In this condition stood the law, with the modifications before stated, made by the acts of 1808 and 1809, until the convention of 1834 ; and it is corroborative of the vjpw already taken, that no license, was supposed to be given by any clause of the Constitution to hold incompatible offices, that the act of 1811, allowing justices of the peace to hold offices under United States Government, is revised in 1S54, and amended with the proviso, that the United States office shall not be incompatible with his office of justice of the peace.
The next great step to disqualify persons from holding offices, was made by the Convention of 1834. Bj1- art. 4, sec. 4, of the-amendments of the State Constitution, it is provided, “ that no person who shall hold any office or place of trust or profit under the Confederate States, or any department thereof, or under this State, or any other State or government, shall hold or exercise any other office or place of trust or profit under the authority of this State, or he eligible to a seat in either house of the General Assembly: Provided, that nothing herein contained shall extend to offices in the militia or justices of the peaceS
The wide range of this provision owes its origin to two sources. First; Nice distinctions had often been attempted to be made, and sometimes successfully, between offices and places ; and between such of them as were of trust and such as were of profit, (or lucrative.) Second: The public press and politicians had been alarming the people for several years by' announcing the ir ceseant conflict of the public patronage *160 with the freedom of elections. This section cut up by the roots all distinctions between offices and places, and rendered it nugatory whether an office was called one of profit, or of trust simply. The proviso has but one effect, and that is to declare that the offices of justices of the peace and in the militia shall stand as they stood before, and shall be treated and regarded as though the section were stricken from the Constitution. For the office of a saving clause is to leave the matter saved justas it was before the enactment to which the saving is attached. And the section is to be read for interpretation, just as if every office and place embraced in it, had been specified and named, and those not intended to be embraced had been omitted. So that it is perfectly clear, that the offices saved, stand unaffected by the section. Indeed, if this interpretation be not the trug one, but that other is, to wit, that justices of the peace and officers in' the militia may hold and exercise, without surrendering their own, any other and every other office and place of trust or profit, it will follow, that a justice may be judge of the superior and supreme courts, clerk of any of the courts, sheriff, coroner, constable, &c. For the legislative power is not competent to add to the qualifications of an office when they are fixed by the Constitution. And so the wholesome restraints of the common law against incompatibility will be altogether abrogated by a proviso to a clausé, the object of which was to increase and not to diminish incompatibilities of office. This is too unreasonable to be allowed.
After this brief review, it is now apparent, that, to the disqualifications of the common law doctrine of incompatibility, three other classes have been added by the Constitution. 1. The political, which is embraced in section 25 to 30, inclusive. 2. The lucrative. 3. All, whether political or lucrative, or of trust, whether called offices or placeá; and that none of these constitutional restrictions affect a militia officer. He is left as if the Constitution had been wholly silent upon, the subject of disqualification — that is, he is left to the common law. Assuming then, that the Adjutant General is an officer in the militia, the question is, whether the same person can, at the same time, hold and discharge the several offices *161 of Adjutant General of the State, and of Brigadier General of the Confederate States regular army 1 I say hold and discharge, for it is not the mere holding which the public regards, but the discharge of the duties of an office, which concerns the sovereign. And as it is not pretended that either of these offices is a sinecure, he that holds must also discharge : and it is not sufficient that a man may be able to do so bj- his agents. Certainly not as to such offices as imply that the incumbent is selected because of personal trust and confidence, and as an official aid and adviser.
"Whether these offices be inconsistent may be readily ascertained by learning the duties of each. If the officer be not able to discharge the duties, at all times, as well when each office is replete with pressing duties, as when the duties are easy and infrequent in both, and may even abide delay in their performance, it is clear that the offices are imcompati-ble. Let us see what are the duties of Adjutant General. They may be found in the acts of the 2d extra session, of September, 1861, chap. 17, see. 1, 23,46, 60, 61, 65, 67, 78, 80,' 93.
He is the assistant and chief staff of the Governor, as Commander-in-chief of the entire body of militia of the State.
lie is, under the Governor, General-in-chief of all the forces of the State, with the rank of Major General.
lie is presumed to be at all times present with, or, readily accessible to the Governor, as it is a part of his duty to issue all orders of the Governor as Commander-in-chief.
lie is inspector General of the entire body of militia, and as such it is his duty to attend to their enrolment, organization and discipline.
lie is bound to discharge the duties, with certain prescribed assistants, of Quartermaster, Paymaster General, Commissary General and Chief of Ordnance.
He is sworn to obey the orders of the Governor. He must therefore be present to receive them.
His judicial duties require him to receive appeals from the finding in all courts martial, whatever. He is, therefore, the Judge of a court always open, and, of course, as he cannot act in this capacity by deputy, he must always be present, or *162 appeals must go undetermined to the great injury of persons and detriment of the service.
It is his duty to call Boards of officers, and settle military questions, when, in his judgment, they are proper. Of course he must be always in a position to exercise his judgment.
No one but he can order courts of inquiry respecting the nature of any transaction, imputation or accusation made against any officer by an inferior. Of course, he ought to be convenient and accessible to the inferior, for nothing so de-moralizers the army as to keep in suspense charges of insub* oration, oppression or injustice.
' It is his duty to receive the quarterly returns of all officers having the charge of money or property belonging to the State, in such form as he may prescribe ; and it is expressly enacted, that these returns shall be “ carefully examined hj him, and the accounts passed upon and adjusted for settle-meUtP lie may certainly do many of these duties by assistants if he have no time to do them himself. But his presence is at all times necessary to superintend his assistants — to observe their course of conduct — insure their industry and vigilance, and solve all difficulties and questions which may arise —else the returns may be delayed ; or if made, may remain unpassed upon, to the prejudice of the public or the officer, and often to the great injustice of both. Such and so many-are the constant certain duties of the Adjutant General, and it is scarcely necessary to add, that their faithful performance will command the entire time and talents of a man both-industrious and able.
Let us now turn to the office of a Brigadier- General in the Confederate service, and ascertain his duties. This officer is appointed by the Senate of the Confederate States, upon nomination by the President, with a fixed salary. The office is one of high trust and confidence — of great labor and responsibility — and he cannot resign or quit the service until his resignation shall have been duly accepted by the proper authorities.
He takes an oath to obey the orders of the President, as Commander-in-chief of the regular army of the Confederate States.
*163 He is commander of a brigade, which contains from three to five thousand men ; and, as such, he is liable to be required to fill all the duties of his command — among which is to be ever with his brigade, having no control of his own movements, except such as may be extended to him by, the. grace of his superiors, who are in no wise responsible to the Governor. By accepting the office, he binds himself to go whith-ersover the President may direct, and there to remain during his pleasure, so that he cannot of his mere own will, and without permission of the President, remain one hour in the State of North Carolina. In a word, he becomes as much the President’s servant as any soldier in the ranks.
It is manifest, then, that if the duties of each office are required to be performed, the same man cannot do them ; and this is the test as to offices incompatible, “ when from the multiplicity of business in them, they cannot be executed with care and ability.” Bac. Abr. Offices, IL
The test cannot depend on the quantum of duties which may be exacted or forgiven by two independent superiors, having different and divers duties to perform ; for that quantum must depend on the caprice or independent will of such superiors. Moreover, the remission of duties, not clearly allowable to be remitted by law, necessarily devolves on others the duties remitted; which is contrary to public policy. The salaries of offices have no connection with their duties, and can never be considered in determining the question of their compatibility. And liow completely soever the refusal to receive the two salaries of incompatible offices may exonerate the incumbent from the censure of covetousness, it cannot change tire nature, nor diminish the duties of either office; and in law the obligation is just as great to discharge the office for which pay is refused, as that for which pay is taken. If, therefore, the offices are incompatible, that of Adjutant General became, on the acceptance of the Brigadiership, absolutely vacant, and was then as open for appointment, as if it had been at'that time expressly surrendered; Milward v. Thatcher, and Rex v. Trelawny, ubi supra. If it did not then become absolutely vacant, because there was no authority in being to accept the implied resignation, it certainly be *164 came so when that authority gave its assent by declaring the vacancy, as did the resolutions of the General Assembly. The King v. Patterson, 24, E. C. L. R. 11. In all such cases an appointment to tlie office thus vacated, or liable to be vacated, is an amotion of the incumbent de faoto., The King v. Pateman, 2, T. R., 777. I conclude, therefore, that the Governor may appoint to the office of Adjutant General.
We regret that we could not obtain the notes of the able argument of Ex-Gov. Bragg, who appeared for Gen. Martin.
OPINION OF THE JUDGES.

In the matter of the Adjutant Generalship.

At the request of His Excellency Gov. Yanee, and of Gen. Martin, the Judges of the Supreme Court have heard a full argument on the questions of law presented by the facts set out in “ the case agreed,” and certify their opinion to be, that the office of Brigadier General under the Confederate States is incompatible with the office of Adjutant General under the State of North Carolina; and that, on the facts stated, “the office of Adjutant General is vacant, and the Governor may lawfully proceed to appoint thereto.”
It is proper to state, that in giving tins opinion wo do not act as a Court, but merely as Judges of -the Court, and have treated the matter in the same light, and with the same full consideration as if the case'had been regularly before the Court, upon a proceeding appropriate to present the question.
We were induced to take this action, and felt not only at liberty to do so, but conceived it was in some measure our duty thus to aid a co-ordinate department of the government, because we were informed by His Excellency the Governor that the subject would in that way be relieved from all further embarrassment; and that the public interest required that it should be adjusted sooner than it could be done by the regular mode of proceeding in Court, particularly as the Court now holds but one term during the year. Berry v. Waddell, 9th Iredell, 318, appendix.
E. M. PEAESON, C. J. S, C.
WILL. H. BATTLE, J. S. C.
M. E. MANLY, J. S. 0.
Raleigh, March 11, 1863.